[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs, The Queach Corp. and Vivian Vigliotti (collectively referred to as "Queach"), have appealed from the denial of their CT Page 7934 application for a special exception by the defendant Planning Zoning Commission of the Town of Branford ("PZ"). Aggrievement is conceded. On the merits, Queach claims in its appeal that the PZ acted illegally, arbitrarily, and in abuse of its discretion. After a careful review of the evidence submitted by the parties, however, I find that the PZ did not abuse its discretion and that the appeal must be dismissed.
To state a somewhat complicated matter briefly, Queach is the owner of 163 acres located in an R-5 residential zone in Branford. (The second plaintiff, Vigliotti, owns an adjacent 43 acre parcel.) On February 11, 1999, Queach filed an application for a special exception with the PZ. The application sought permission to develop the parcels in question as an "open space" subdivision.
The Branford Zoning Regulations set forth a two-step process by which an application for a special exception pertaining to a proposed Open Space Residential Development. Plan ("OSRDP") is to be considered. The first step is a "preliminary action." Reg. ¶ 34.4 provides that:
 The Commission may give preliminary approval to the application if the Commission finds that one or more of the purposes specified in Paragraph 34.2 will be accomplished, that the standards and conditions of Paragraph 34.7 have been met, and that the proposed Open Space Residential Development Plan will not be detrimental to the health, safety and property values of the neighborhood.
The "purposes" provision of ¶ 34.2, to which ¶ 34.4 refers, consists of a list of five "open space purposes," including the preservation of "land as unsubdivided and undeveloped open space," "land for park and recreation purposes," "land for purposes of conserving natural resources," "particular areas and terrain having qualities of natural beauty or historic interest," and the protection of "streams, rivers and ponds so as to avoid flooding, erosion and water pollution."
The "standards and conditions" of ¶ 34.7, to which ¶ 34.4 also refers, include the following provisions relevant to this case:
Par. 34.7.3 "Number of Lots: The total number of lots shown on the Open Space Residential Development Plan shall not exceed the number that could be created in conformity with the regular . . . R-5 requirements."
Par. 34.7.4 "Number of Dwelling Units: The total number of single family dwelling units shown on the Open Space Residential Development CT Page 7935 Plan shall not exceed the number that could be created in conformity with the regular . . . R-5 district requirements."
Par. 34.7.5 "Lot Area and Shape: Lots in . . . R-5 Districts, except land reserved for open space purposes, shall meet the following minimum standards
"Residence R-5 Districts:
"Mimmum Lot Area 20,000 sq. ft. per dwelling
"Mimmum Dimension of Square 125 feet
"Minimum Frontage 110 feet"
Par. 34.7.6 "Setbacks. . . . In Residence R-5 Districts, buildings and other structures may extend to within 40 feet of any street line or rear property line and to within 15 feet of any side or other property line."
In the event preliminary approval is granted, 34.5 requires the applicant to "submit final development plans in conformance with and including all the information required by the preliminary approval."
Queach modified its application for preliminary approval several times in the months following its initial submission. The PZ made physical inspections during a site visit on May 13, 1999. Public hearings on the application were held on June 17, 1999 and July 1, 1999. The PZ met questioned the Town Planner at its regular meeting on July 22, 1999. The PZ additionally received a written report from its staff for its meeting on June 17, 1999, and an addendum to that report for its meeting of July 1, 1999. A report was received from the Inland Wetlands Commission. In the course of these submissions, in addition to receiving expert evidence supplied by Queach, the PZ received the competing opinions of the Town Planner and the Town Engineer that Queach's application did not conform with the standards and conditions of ¶ 34.7.
On September 2, 1999, the PZ voted to deny Queach's application for preliminary approval. The reasons for the denial were set forth in a lengthy and thorough written resolution. The resolution states that "the standards and conditions of Paragraph 34.7 have not been met" in a number of respects. The following nonconformities are itemized:
• The application fails to comply with ¶¶ 34.7.3 ("Number of Lots") 34.7.4 ("Number of Dwelling Units"). The resolution explains that, "Submitted plans show 143 lots in the conventional subdivision and CT Page 7936 145 lots in the OSRDP. Clearly the number of lots in the OSRDP exceeds the maximum allowable by at least two. In addition, many of the lots in the conventional subdivision (revision of 6/22/99) do not meet requirements for approval of lots in an R-5 zone, thereby reducing the number of conventional lots that could be approved well below the 145 proposed in the OSRDP. Staff reports submitted at the public hearings examined the compliance of lots in the proposed conventional subdivision and demonstrated that many more lots do not meet zoning standards." (The resolution itemizes numerous examples in support of the statement just quoted.)
• The application fails to comply with ¶ 34.7.5 ("Lot Area and Shape"). The resolution describes one lot in the proposed OSRDP that fails to comply with the minimum area requirement and numerous lots that fail to comply with the minimum dimension of square requirement.
• The application fails to comply with ¶ 34.7.6 ("Setbacks"). The resolution itemizes ten "[l]ots in the proposed OSRDP on which no residence of normal size and shape could easily fit."
The resolution states that because the PZ has found that the standards and conditions of ¶ 34.7 have not been met, it makes no finding as to whether the "purposes specified in Paragraph 34.2 will be accomplished" and no finding as to whether "the proposed OSRDP will not be detrimental to the health, safety and property values of the neighborhood."
The appeal now before the Court was timely commenced by service of process on September 20, 1999. The appeal was heard on June 19, 2000.
The law governing the Court's review of the PZ's decision is set forth in Irwin v. Planning Zoning Commission, 244 Conn. 619, 711 A.2d 675
(1998):
 Although it is true that the zoning commission does not have discretion to deny a special permit when the proposal meets the standards, it does have discretion to determine whether the proposal meets the standards set forth in the regulations. If, during the exercise of its discretion, the zoning commission decides that all of the standards enumerated in the special permit regulations are met, then it can no longer deny the application. The converse is, however, equally true. Thus, the zoning commission can exercise its discretion during the review of the proposed special exception, as it applies the regulations to the CT Page 7937 specific application before it.
 . . . . "In situations in which the zoning commission does state the reasons for its action, the question for the court to pass on is simply whether the reasons assigned are reasonably supported by the record and whether they are pertinent to the considerations which the commission is required to apply under the zoning regulations." . . . . "[O]n factual questions . . . a reviewing court cannot substitute its judgment for that of the agency.". . . . If there is conflicting evidence in support of the zoning commission's stated rationale, the "reviewing court . . . cannot substitute its judgment as to the weight of the evidence for that of the commission.". . . . "The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given."
244 Conn. at 628-29. (Citations omitted.)
Under ¶ 34.4 of the Branford Zoning Regulations, the PZ may grant preliminary approval of an application for a special exception pertaining to a proposed OSRDP if, and only if, it makes three findings: (1) "that one or more of the purposes specified in Paragraph 34.2 will be accomplished, (2) "that the standards and conditions of Paragraph 34.7 have been met," and (3) "that the proposed Open Space Residential Development Plan will not be detrimental to the health, safety and property values of the neighborhood." These required findings are stated in the conjunctive. Queach admitted at argument that because all three findings must be made in order for a preliminary application to be approved, a negative finding on any of the three requirement necessarily dooms the proposal.
In this case, the PZ has specifically found that "the standards and conditions of Paragraph 34.7" have not been met. This conclusion is supported by numerous detailed findings of a variety of nonconformities involving the number of lots, the number of dwelling units, lot areas and shapes, and setbacks. Irwin teaches that, on these factual questions, the Court is not to substitute its judgment for that of the agency. Rather, the agency's decision must be sustained if any of the reasons assigned are reasonably supported by the record. 244 Conn. at 629.
The reasons assigned by the PZ for the action at issue in this case are well documented in the record. As discussed above, the PZ based its decision on its determination that Queach's proposal failed to CT Page 7938 conform with the standards and conditions of ¶ 34.7 with respect to the number of lots, number of dwelling units, lot area and shape, and setback requirements. The staff report and the testimony of Town Planner Shirley Rasmussen, all of which are included in the record, provide an adequate basis for these assessments. Rasmussen specifically stated that the number of lots and dwelling units in the proposal exceeded the number of lots and dwelling units that could be created with the regular R-5 requirements. She also expressly stated that Queach's proposal failed to satisfy the minimum requirements for lot area, shape, and setbacks. Rasmussen's testimony was supported by a wealth of detail and substantial evidence in the written record. In addition, as mentioned, the PZ made physical inspections during a site visit on May 13, 1999. Under these circumstances, the PZ cannot be said to have abused its discretion.
Two rhetorical points made by Queach in its argument must be briefly addressed. First, Queach repeatedly claimed, in its somewhat vitriolic argument, that the PZ's decision was a "political" one. The record shows, however, that the decision of the PZ was careful, thoroughly detailed, and grounded in the facts. Queach has submitted no evidence outside of the written record to establish its claim that the decision of the PZ was improperly motivated. Second, Queach repeatedly suggested that, since its application was one for preliminary approval, it is unnecessary that the standards and conditions of ¶ 34.7 be precisely met, as long as the proposal comes reasonably close to meeting those standards and conditions. That is not, however, what ¶ 34.4, governing preliminary applications, provides. Par. 34.4 requires, as a condition of preliminary approval, that the PZ find "that the standards and conditions of Paragraph 34.7 have been met." This is not an ambiguous provision, and the PZ plainly acted correctly when it determined that the standards and conditions of ¶ 34.7 had to be met in order for a preliminary application to be approved. For reasons already stated, the PZ also acted well within its discretion when it determined, on the basis of record evidence, that this crucial requirement had not been satisfied.
The appeal is dismissed.
 Jon C. Blue Judge of the Superior Court